**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | : | | |
| Plaintiff, | : | Civil Action No.: | 25-cv-3911 |
| v. | : | Re Document No.: | 5 |
| APPROXIMATELY 1,537,935 USDT, | : | | |
| Defendant. | : | | |

# MEMORANDUM OPINION

## GRANTING PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AND FINAL ORDER OF FORFEITURE

## I. INTRODUCTION

This *in rem* forfeiture action arises out of an investigation by the Memphis Virtual Currency Task Force, comprised of members from the United States Secret Service and the Federal Bureau of Investigation. Plaintiff United States of America ("the Government") seeks the forfeiture of approximately 1,537,935.77125 USDT ("Defendant Property"). The Government asserts that the funds were connected to several federal offenses. Specifically, the Government contends that the Defendant Property constitutes proceeds of wire fraud and wire fraud conspiracy offenses and that those proceeds were subsequently laundered. No claimant responded to the Government's complaint, and the Clerk of Court entered default on March 2, 2026. The Government has now moved for default judgment and an order of forfeiture against Defendant Property. For the reasons set forth below, the Court grants the Government's motion.

## II. BACKGROUND

The Government alleges that individuals abroad stole funds from approximately 95 victims through cryptocurrency investment scams and laundered the funds through a convoluted web of cryptocurrency wallets to evade detection. In carrying out this scheme, the Government alleges that the scammers committed wire fraud and wire fraud conspiracy offenses (in violation of 18 U.S.C. §§ 2, 3, 1343, 1349), as well as money laundering and money laundering conspiracy offenses (in violation of 18 U.S.C. §§ 2, 3, 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), 1956(h)). The Court first provides background on these types of scams before recounting the allegations concerning the particular scams at issue here.

### A. Cryptocurrency Investment Scams

Cryptocurrencies are digital representations of value that typically lack a central administrator and depend on a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts. Verified Compl. For Forfeiture *In Rem* ("Compl.") ¶ 19, ECF No. 1. Virtual currency addresses are an alphanumeric string, often associated with virtual currency wallets, that designates the virtual location on a blockchain. *Id.* ¶ 21–22. Virtual currency wallets may control multiple addresses and some wallets are "unhosted," which means they do not require a third party's involvement to facilitate transactions. *Id.* ¶ 24–25. When a transaction occurs, a fee must be paid, often referred to as "gas fees." *Id.* ¶ 33. Gas fees can be used to identify and trace ownership to the individuals associated with a particular address, functioning as a digital fingerprint left behind after transactions. *Id.* ¶ 34–35. Some virtual currencies have value equivalent to real currency, such as Tether tokens (USDT), which has a value pegged to the U.S. dollar. *Id.* ¶ 19, 28–29. USDT is sent and received

from USDT "addresses," which are generally anonymous and represented as a 46 to 48-character-long case-sensitive string of letters and numbers. *Id.* ¶ 30–31.

Cryptocurrency confidence scams, also known as "Pig Butchering," are a type of internet-based cryptocurrency investment scam.[1] *Id.* ¶ 36. These scams typically involve four stages: 1) cold contact with a victim via text or social media where the perpetrator pretends to have contacted the wrong number but continues communication with the victim; 2) the perpetrator establishes a relationship with the victim by continuing to message them over an extended period of time that can span days, weeks or months; 3) the perpetrator creates a narrative to induce the victim to invest on some form of cryptocurrency in a fraudulent platform, and 4) after the victim stops sending payments or questions the platforms' legitimacy, the perpetrator cuts off all contact. *Id.* A well-known type of confidence scheme is the "romance scam." *Id.* ¶ 37.

These scams rely heavily on mobile banking and investment apps that, at first, seem legitimate but are created and controlled by the perpetrators. *Id.* ¶ 43–44. Perpetrators create a façade of balances and transactions that is not connected to any legitimate financial institution, and they use inflated numbers to entice victims into investing more. *Id.* ¶ 45–46. One stage of the scheme allows the victims to withdraw funds, which victims believe are gains but typically originate from other victims. *Id.* ¶ 47. Due to the highly technical nature of cryptocurrency, the perpetrators are successful at explaining otherwise convoluted terms to the victims, convincing them to invest in cryptocurrency. *Id.* ¶ 48.

---

[1] According to the Government, the phrase "Pig Butchering" "is translated from Chinese shāzhūpán and refers to a scam in which the victim is 'fattened up prior to slaughter.'" Compl. ¶ 36.

**B. Government's Investigation**

The Government's investigation revealed that foreign cryptocurrency confidence scammers stole funds from approximately 95 victims and laundered the funds through several cryptocurrency wallets to evade detection and hide the origin of the funds. *Id.* ¶ 1. Defendant Property is associated with virtual currency address 0xff928ae4b20c0b9b2f02a4ed9983242-4991ba89b (the "Subject Virtual Currency Address"), which held 1,537,935.771225 USDT. *Id* ¶ 16.

In September 2024, Victim-1 reported that they were a victim of a cryptocurrency investment scam resulting in the loss of over $600,000. *Id.* ¶ 49. In or around July 2024, Victim-1 met Scammer-1 on the online dating platform Hinge. Scammer-1 requested Victim-1 to consider investing in cryptocurrency and provided an investment website for the victim to do so. The website, contractmarker-app.com, displayed logos resembling those of an actual cryptocurrency investing website, Coinbase. *Id.* ¶ 50. Victim-1 accessed the website and started "investing" amounts between $1,000-$2,000. *Id.* ¶ 51. Scammer-1 then "loaned" $300,000 worth of "coins" to Victim-1 by depositing it in Victim-1's account to convince them to invest more money, leading Victim-1 to deposit $150,000 worth of their own funds. *Id.* ¶ 52.

When Victim-1 tried to cash out their profits, they received an error message stating that the $300,000 loaned by Scammer-1 was associated with money laundering. *Id*. ¶ 53. The scam website asked Victim-1 to deposit $300,000 more of their own money; after doing so, the balance showed a $1,600,000 balance, but Victim-1 was unable to withdraw funds. *Id.* ¶ 53. Scammer-1 advised Victim-1 that an additional $180,000 in taxes needed to be paid, and Victim-1 made the additional deposit. *Id.* ¶ 54. Victim-1 attempted once again to withdraw their funds

but was informed that another payment of $160,000 was required, at which point Victim-1 realized that they had been scammed and had lost approximately $615,424. *Id.* ¶ 54.

Victim-1 revealed to investigators that they had deposited around $176,545 worth of USDT from their "invested" funds to an address provided by the website's customer service, 0x771367759065208a8547a1f633cb887365c7580f ("Scam Address 580f"). *Id.* ¶ 55. Investigators traced $100,000 worth of USDT of Victim-1's funds from Scam Address 580f through two other unhosted addresses and ultimately to the Subject Virtual Currency Address, where the funds remained until they were seized by law enforcement. *Id.* Investigators identified approximately 91 intermediary unhosted addresses involved in the movement of funds that were ultimately deposited in the Subject Virtual Currency Address. *Id.* ¶ 56. The intermediary addresses were established around the same timeframe as when Victim-1 was scammed (June 2024 to August 2024) and exhibited large dollar deposit transactions, followed by a pattern of rapid movement of funds with large corresponding withdrawals.[2] *Id.* ¶ 57(i)–(iii). Five intermediary addresses received and sent transactions over $100 million in total between June 2024 to August 2024, and two of the intermediary addresses received and processed approximately $400 million in cryptocurrency in just twelve months.[3] *Id.* ¶ 57(iii). The volume of transactions produced a string of blockchain transaction fees ("gas fees") that allowed the Government to track the movement of funds and deduce that it was performed in a manner meant to conceal or disguise the nature, source, ownership, or control of proceeds from an unlawful activity—in this case, wire fraud. *Id.* ¶ 58.

[2] From approximately June 2024 to August 2024, the intermediary addresses each processed an average of approximately $25 million in cryptocurrency. Compl. ¶ 57(ii).
[3] The two addresses directly sent $2.5 million combined to the Subject Virtual Currency Address. Compl. ¶ 57(iii).

Investigators identified an additional five victims scammed around the same time as Victim-1. *Id.* ¶ 59. These victims sent a combined amount of approximately $4 million to a group of addresses designated by law enforcement as "Pig Butchering Group 26." *Id.* Pig Butchering Group sent approximately $100,000 of the victims' funds through five separate addresses in the span of a week, ultimately depositing them in the Subject Virtual Currency Address. *Id.* Through reports to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"), IC3.gov, and four virtual currency exchanges, investigators identified another 85 victims that sent a combined amount of approximately $29.85 million to addresses known to be associated with cryptocurrency scams. *Id.* ¶ 60. Approximately $139,930 of the funds were laundered through nine separate addresses and were then sent to the Subject Virtual Currency Address. *Id.* At the time of seizure, $90,000 were still held in the Subject Virtual Currency Address. *Id.* Investigators also identified approximately 120 additional suspended victims whose funds were sent to the Subject Virtual Currency Address. *Id.* ¶ 61. Investigators have traced approximately $430,148 of the victims' funds into the Subject Virtual Currency Address. *Id.*

In light of these allegations, the Government seeks forfeiture of approximately 1,537,935.77125 USDT pursuant to 18 U.S.C. § 981(a)(1)(A), which authorizes forfeiture of property "involved in a transaction or attempted transaction in violation of [18 U.S.C. §] 1956," the federal money laundering statute, and pursuant to 18 U.S.C. § 981(a)(1)(C), which authorizes forfeiture of property "which constitutes or is derived from proceeds traceable to a violation" of wire fraud and conspiracy to commit wire fraud. *See* 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 1957(c).

### C. Procedural History

On November 11, 2025, the Government commenced this civil forfeiture action *in rem* against Defendant Property by filing a Verified Complaint. *See* Compl. The Verified Complaint alleges that Defendant Property constitutes proceeds of wire fraud and wire fraud conspiracy offenses and that those proceeds were subsequently laundered, in violation of 18 U.S.C. §§ 2, 3, 1343, 1349, 1956(a)(1)(B)(i)–(a)(2)(B)(i), 1956(h), and 1957(c). *Id.* ¶¶ 63, 65. The Government thus contends that Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A)–(C). *Id.* ¶¶ 64, 66. On November 20, 2025, the Government posted a Notice of Civil Forfeiture on its official website, www.forfeiture.gov, for thirty consecutive days. *See* Decl. of Publ'n, ECF No. 2. Any verified claim in response to the notice had to be filed no later than January 20, 2026.[4] *See* Fed. R. Civ. P. Supp. G(5)(a)(ii)(B). No such claim was filed in this case. *See* Req. for Entry of Default ¶ 2, 4, ECF No. 3. Due to a lack of response to the notice, the Clerk of Court entered default judgment against all persons or entities that would otherwise claim an interest in Defendant Property. Clerk's Entry of Default, ECF No. 4. The Government now moves for default judgment and a final order of forfeiture against Defendant Property. Pl,'s Mot. Default J. ¶ 12, ECF No. 5.

## III. LEGAL STANDARD

### A. Motion for Default Judgment

[4] The Court observes that the Government's filings contain inconsistent dates regarding the deadline to file a verified claim in response to the notice by internet publication. *Compare* Pl.'s Request for Entry of Default (citing a deadline of January 19, 2026). ECF No. 3, *with* Mot. Default J. at 2 (citing January 24, 2026), 6 (citing January 23, 2026). Because these dates have since passed without a verified claim having been filed, this discrepancy does not affect the Court's analysis.

Default is appropriate in forfeiture actions when the "party against whom a judgment is sought . . . has failed to plead or otherwise defend" the action. Fed. R. Civ. P. 55(a); *see also United States v. All Assets Held in Acct. No. XXXXXXXX*, 330 F. Supp. 3d 150, 155–56 (D.D.C. 2018). Two steps must be followed by a party seeking default judgment. Fed. R. Civ. P. 55; *see also Bricklayers & Trowel Trades Int'l Pension Fund v. KAFKA Constr., Inc.*, 273 F. Supp. 3d 177, 179 (D.D.C. 2017). First, the party must request that the Clerk of Court enter default against the party who "has failed to plead or otherwise defend" the action. Fed. R. Civ. P. 55(a); *Bricklayers*, 273 F. Supp. 3d at 179. Second, the party must move for entry of default judgment. Fed. R. Civ. P. 55(b). However, a defendant's failure to respond does not automatically entitle a plaintiff to default judgment. *See United States v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte Ltd.*, 368 F. Supp. 3d 10, 17 (D.D.C. 2019). "At that point, the plaintiff 'must prove his entitlement to the relief requested using detailed affidavits or documentary evidence on which the court may rely.'" *United States v. Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d 1, 4 (D.D.C. 2020) (quoting *Ventura v. L.A. Howard Constr. Co.*, 134 F. Supp. 3d 99, 103 (D.D.C. 2015)). For the plaintiff to be entitled to default judgment, the complaint must state a claim for relief. *Velmur*, 368 F. Supp. 3d at 17. And "[a] defaulting defendant is deemed to admit every well-pleaded allegation in the complaint." *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002); *United States v. Oil Tanker Bearing Int'l Mar. Org. No. 9116512*, 480 F. Supp. 3d 39, 43 (D.D.C. 2020).

**B. Civil Forfeiture**

Pleading requirements in civil forfeiture actions are governed by the Supplemental Rules and by the Federal Rules of Civil Procedure, to the extent they are "[not] inconsistent with the[] Supplemental Rules." Fed. R. Civ. P. Supp. R. A(2). Supplemental Rule G establishes the

requirements for a complaint in such an action. The complaint must be verified, state the grounds for jurisdiction, describe the property "with reasonable particularity," identify the statute under which the action is brought, and "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2). "Before a default judgment is entered pursuant to a complaint for forfeiture *in rem*, the government must also show that it complied with the notice requirements contained in the Supplemental Rules." *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38, 46 (D.D.C. 2018).

## IV. ANALYSIS

The Government asks the Court to enter default judgment and order the forfeiture of Defendant Property. Because the Government has properly provided notice to all known potential claimants through internet publication, no verified claim has been filed in response to that notice, and the Verified Complaint sufficiently alleges that Defendant Property is subject to forfeiture, the Court grants the Government's motion for default judgment.

### A. Notice

Under Supplemental Rule G, publication is required for a judgment of forfeiture to be entered. Fed. R. Civ. P. Supp. G(4)(a)(i). This notice must be published within a reasonable time after filing the complaint or a time ordered by the Court. *Id.* The Government must pursue reasonable options for publication to notify potential claimants. *Id.* at G(4)(a)(iv). One such option is publication on an official government forfeiture website for at least thirty consecutive days. *Id.* at G(4)(a)(iv)(C). The publication notice must "describe the property with reasonable particularity," :state the times under Rule G(5) to file a claim and to answer," and "name the government attorney to be served with the claim and answer." *Id.* at G(4)(a)(ii)(A)–(C).

Here, the Government complied with Supplemental Rule G's notice requirement. The Government published a notice on November 20, 2025, eight days after filing its Verified Complaint. *See* Decl. of Publication at 1, ECF No. 2-1. The Government published a notice on its official forfeiture website, www.forfeiture.gov, for thirty consecutive days, from November 20, 2025 until December 19, 2025. *Id.* at 3.The online notice of forfeiture described the amount of cryptocurrency associated with the virtual currency address, the type of currency, the last 5 digits of the address, when the seizure occurred, and the timing under Supplemental Rule G(5) to file a claim and answer. *Id.* at 2. It also provided the name and address of the government attorney whom potential parties should serve. *Id.* at 2. Despite publication, no parties filed a claim within 60 days of the notice being posted on the Government's forfeiture website. *See* Req. for Entry of Default ¶ 2, 4. Accordingly, the Government has satisfied the public notice obligation. *See* Fed. R. Civ. P. Supp. R. G(4)(a)(iv)(C).

**B. Adequacy of the Complaint**

In addition to the notice requirements, Supplemental Rule G also sets the specifications of a complaint, which must (1) "be verified;" (2) state the grounds for jurisdiction, and venue; (3) "describe the property with reasonable particularity;" (4) "if the property is tangible, state its location when any seizure occurred and—if different—its location when the action is filed;" (5) "identify the statute under which the forfeiture action is brought;" and (6) "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2). Courts consider these requirements to constitute a "higher standard of pleading" than that imposed by Federal Rule of Civil Procedure 8. *See United States v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008).

However, Rule 8 "may help to clarify when a civil forfeiture complaint" states a claim. *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 249 (S.D.N.Y. 2010).

The Government has successfully met the first four requirements, which are "largely formal." *Velmur*, 368 F. Supp. 3d at 19. The Government's complaint is verified, identifies the basis for jurisdiction and venue, describes the seized cryptocurrency by value as well as the address it was seized from, and identifies the statutes under which the forfeiture action is being sought (i.e., 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C)). *See* Compl. ¶ 3–16.

To satisfy the fifth pleading requirement, which is considered more substantive, the Government's complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." *United States v. All Assets Held in Account Number XXXXXXXX*, 83 F. Supp. 3d 360, 366 (D.D.C. 2015) (quoting Fed. R. Civ. P. Supp. R. G(2)(f)). Here, the Government alleges that Defendant Property is forfeitable because the funds were involved in a wire fraud and money laundering scheme. Indeed, the Verified Complaint, which presents information from the investigation of the Memphis Virtual Currency Task Force, supports a "reasonable belief" that Defendant Property was so involved.

The Government's allegations place Defendant Property at the center of a broader money laundering and wire fraud scheme. According to the Complaint, funds obtained from multiple victims were transferred through a series of intermediary unhosted addresses before reaching their ultimate destination, the Subject Virtual Currency Address, which held Defendant Property. Compl. ¶ 56. The intermediary addresses used to funnel funds from Scam Address 580f to the Subject Virtual Currency Address were established during approximately the same period that Victim-1 was defrauded. *Id.* ¶ 57(i). The Government further alleges that blockchain transaction records and associated "gas fees" allowed it to trace numerous "rapid transfers" of

cryptocurrency that appeared to lack any legitimate purpose. *Id.* ¶ 58. These rapid transfers, the Government alleges, are consistent with efforts to conceal or disguise the source, ownership, control, or nature of funds derived from unlawful activity. *Id.*

The Government's investigation also identified additional victims whose funds were traced through the same network of addresses. In addition to Victim-1, the Government identified and confirmed five other victims who, between June 2024 and August 2024, collectively transferred approximately $4 million to a group of addresses designated as "Pig Butchering Group 26." *Id.* ¶ 59. The Complaint alleges that Pig Butchering Group 26 then routed approximately $100,000 of those victim funds through five intermediary addresses before ultimately depositing the funds into the Subject Virtual Currency Address. *Id.*

The Government also identified a larger group of 85 victims through reports submitted to FinCEN and other entities. *Id.* ¶ 60. Those victims collectively transferred approximately $29.85 million to addresses associated with cryptocurrency scams. *Id.* Of that amount, approximately $139,930 was allegedly laundered through nine intermediary addresses before being transferred to the Subject Virtual Currency Address. *Id.*

Taken together, the Government's allegations, which must be taken as true for the purposes of a motion for default judgment, *see, e.g.*, *R.W. Amrine Drywall Co.*, 239 F. Supp. 2d at 30, detail a wire fraud and money laundering scheme perpetrated by foreign actors and explain how Defendant Property constitutes a product of that scheme. Accordingly, the Government has satisfied its burden under Supplemental Rule G by alleging facts sufficient to establish "a reasonable belief" that it will be able to prove at trial that Defendant Property constitutes property involved in money laundering transactions and/or wire fraud. *See* Fed. R. Civ. P. Supp. R. G(2)(f). The Government has therefore sufficiently alleged that Defendant Property is subject

to forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C); *Cf. Oil Tanker*, 480 F. Supp. 3d at 43 (explaining that a motion for default judgment may be denied "where the allegations of the complaint," which must be taken as true, "are legally insufficient to make out a claim" (quoting *Gutierrez v. Berg Contracting, Inc.*, No. 19-3044, 2000 WL 331721 at *2 (D.D.C. Mar. 20, 2000))).

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Default Judgment and Final Order of Forfeiture (ECF No. 5) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 2, 2026

RUDOLPH CONTRERAS
United States District Judge